UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

**OAK FORD OWNERS ASSOCIATION,
INC.,**

     **Plaintiff,**

**vs.**             **Case No. 8:05-CV-2136-T-27EAJ**

**AUTO-OWNERS INSURANCE
COMPANY,**

     **Defendant.**

_____/

## ORDER

  **BEFORE THE COURT** are: 1) Defendant's Motion for Summary Judgment (Dkts. 16, 25), to which Plaintiff has responded in opposition (Dkt. 29); and 2) Plaintiff's Motion for Summary Judgment (Dkt. 17), to which Defendant has responded in opposition (Dkt. 27). Upon consideration, Defendant's motion is GRANTED and Plaintiff's motion is DENIED.

### *Background*

  Plaintiff Oak Ford Owners Association, Inc. ("Plaintiff") seeks a declaration that it has coverage under a general liability insurance policy underwritten by Defendant Auto-Owners Insurance Company ("Defendant"). Plaintiff is comprised of the Board of Directors for Phase 1 of the Oak Ford subdivision. Phase 1 of the development is a collection of 80 homesites located on five-acre tracts in Sarasota, Florida. (Cutler Dep. at 6). During the relevant time period, Plaintiff was insured under a Commercial General Liability policy ("CGL"), which included a Directors & Officers endorsement covering the negligent acts of Plaintiff's directors and officers ("D&O"). (Dkt. 1, Exh. 1).

1

Plaintiff seeks coverage for sums it became liable for as a result of a dredging project it undertook on neighboring land. For a number of years preceding the events at issue, Oak Ford residents experienced drainage problems on their individual properties and Oak Ford common property. (Culter Dep. at 26-28). Frank Wesley, who was elected to the Board of Directors in November 2003, formed a Drainage Control Committee comprised of six persons, including himself, to identify the cause of the problem. (Wesley Dep. at 145, 148, 49). Based on their observations, the Committee members determined that Howard Creek, an adjacent waterway, was blocked and causing the drainage problems. (Wesley Dep. at 148; Culter Dep. at 32). The Committee did not seek the assistance of engineers or other environmental professionals in determining the cause of the flooding. (Wesley Dep. at 68). Howard Creek ran north to south, from property owned by the City of Sarasota to property owned by Hi Hat Ranch. (Kastner Dep. at 24). Rick Turner, the owner of Hi Hat Ranch, gave Plaintiff permission to dredge the creek to alleviate what was believed to be the cause of the flooding on Plaintiff's property. (Wesley Dep. at 85-86).

Between April 29, 2004 and May 27, 2004, Plaintiff dredged approximately 3.4 miles of Howard Creek. (Dkt. 17 at 5). Plaintiff's board of directors approved $5000 for the project. (Dkt. 17 at 5). Mr. Wesley rented a track hoe, which he and other Oak Ford residents used to remove fill[1] from the creek and place it on the bank. (Wesley Dep. at 87, 90, 99, 101). Mr. Turner indicated where they could deposit the fill, so that he could use it at a later date. (Wesley Dep. at 95, 157). Plaintiff did not employ any contractors or subcontractors to perform the work. (Wesley Dep. at 102). Only one volunteer, Fernando Cocoilo, from whom the track hoe was rented, had any heavy equipment experience. (Wesley Dep. at 62). The track hoe was operated from the bank, with fill

---

[1]The material that is removed from the creek is known as dredge material, spoil, soil, and fill. (Ondercin Dep. at 17). For consistency, the term "fill" is used throughout this discussion.

placed behind the machine as it progressed north to south along the creek. (Dkt. 22-2, Restoration Plan at 1). The fill piles were left at the edge of the creek, in some places reaching twelve to fifteen feet in height. (Kastner Dep. at 65, 79). However, in many places, the overall height of the fill piles included old fill from previous excavation. Specifically, there were 1.2 acres of new fill standing alone, 5.91 acres of new fill placed on old fill, and 2.39 acres of old fill standing alone. (Kastner Dep. at 146; Restoration Plan at 1-2). The overall result of the project was a widened and deepened creek. (Restoration Plan at 1; Kastner Dep. at 42). Ms. Kastner, a senior engineer with the SWFWMD, testified that she had never seen that type of volume removed in an unauthorized dig. (Kastner Dep. at 87). The creek was deepened, on average, two feet. (Kastner Dep. at 33).[2]

On May 12, 2004, Robert Keyser, an Oak Ford resident and former member of the board of directors, contacted the Southwest Florida Water Management District (SWFWMD) and the County of Sarasota ("County") about the project. (Keyser Dep. at 26-27; Dkt. 1, Exh. 4 at 3). Plaintiff had not obtained any of the necessary permits from SWFWMD or the County. (Dkt. 17 at 5). SWFWMD and the County investigated and initiated enforcement actions against Plaintiff, the City of Sarasota, and Hi Hat Ranch. (Dkt. 17 at 5). The project violated SWFWMD and County regulations, which prohibited removal of fill and placement of fill in wetland areas and tree lines.

---

[2]  As the parties note, the removal of the fill led to other environmental impacts. The functional value of vegetation and the wildlife utilization of vegetation at the bottom of the creek were lost when the fill was removed. (Kastner Dep. at 139). On the banks of the creek, the fill that was placed on the wetland area destroyed the vegetation that it was placed on. (Kastner Dep. at 49; Ondercin Dep. at 26-27). Where new fill was placed on old fill piles, the vegetation that had grown on the old fill piles was destroyed. (Pluta Dep. at 75). Kelly Pluta, an environmental specialist with the County, testified that an unknown number of trees had been killed or damaged during the project, due to the fill and the equipment. (Pluta Dep. at 111, 72, 40; Kastner Dep. at 77). Fill left on the banks decreased the capacity of the floodplain, which had the potential to result in drainage impacts to the adjoining land. (Pluta Dep. at 26; Henslick Dep. at 87; Ondercin Dep. at 21). In addition, because Plaintiff did not use best management practices ("BMPs") for erosion and turbidity control, such as a barrier between the fill piles and the creek, rainfall caused portions of the fill to wash toward the creek. (Kastner Dep. at 54). Ms. Kastner and Clifford Ondercin, who was at the time an environmental technician with SWFWMD, testified that there was highly turbid water within the work zone. (Kastner Dep. at 54, 162; Ondercin Dep. at 23).

(Dkt. 1, Exh. 2, Notice of Ordinance Violation at 2; Kastner Dep. at 52, 54, 101; Pluta Dep. at 37).

Following the investigation, Oak Ford, Hi Hat, and the City of Sarasota entered into consent decrees and a settlement agreement with SWFWMD and the County. (Dkt. 1, Exhs. 3-5). As part of the settlement, Plaintiff developed an approved restoration plan, which included replacing fill back into the creek in order to restore its former depth and width. (Restoration Plan at 4; Pluta Dep. at 72). Plaintiff paid $261,874.14 for engineering services, environmental consulting services, and contracting services to create and implement the restoration plan. (Dkt. 17 at 6). Plaintiff also paid $34,088 to SWFWMD for fines and penalties and $4,000 for enforcement costs. (Dkt. 17 at 6).[3] Ms. Kastner testified that the penalty was based on a matrix that took into account the impact of Plaintiff's project on water quality, water quantity, and the wetland. (Kastner Dep. at 105-06). Plaintiff received $80,000 from the City and Hi Hat Ranch toward settlement of the actions. (Dkt. 17 at 6).

### *Standard*

Summary judgment is proper if following discovery, the pleadings, depositions, answers to interrogatories, affidavits and admissions on file show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56. "An issue of fact is 'material' if, under the applicable substantive law, it might affect the outcome of the case." *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259-60 (11th Cir. 2004). "An issue of fact is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Id.* at 1260. All the evidence and factual inferences reasonably drawn from the evidence must be viewed in the light most favorable to the

---

[3] The initial penalty contemplated was around $800,000, which was reduced because of Oak Ford's restoration plan. (Kastner Dep. at 150-52; Ondercin Dep. at 35).

4

nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1280 (11th Cir. 2004).

Once a party properly makes a summary judgment motion by demonstrating the absence of a genuine issue of material fact, whether or not accompanied by affidavits, the nonmoving party must go beyond the pleadings through the use of affidavits, depositions, answers to interrogatories and admissions on file, and designate specific facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 323-24. Plaintiff's evidence must be significantly probative to support the claims. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986).

The Court will not weigh the evidence or make findings of fact. *Anderson*, 477 U.S. at 249; *Morrison v. Amway Corp.*, 323 F.3d 920, 924 (11th Cir. 2003). Rather, the Court's role is limited to deciding whether there is sufficient evidence upon which a reasonable juror could find for the non-moving party. *Id.*

### Discussion

Plaintiff's claim turns on the language of the CGL policy and applicable exclusions and the D&O endorsement. Under Florida law, "[i]nsurance contracts are construed according to their plain meaning." *See Taurus Holdings, Inc. v. U.S. Fid. and Guar. Co.,* 913 So.2d 528, 532 (Fla.2005). "[I]f the relevant policy language is susceptible to more than one reasonable interpretation, one providing coverage and the [other] limiting coverage, the insurance policy is considered ambiguous." *Id.* (citations omitted). Ambiguous coverage provisions are construed strictly against the insurer, and ambiguous exclusionary clauses *"are construed even more strictly against the insurer than coverage clauses." Fayad v. Clarendon Nat. Ins. Co.*, 899 So. 2d 1082, 1086 (Fla. 2005). However, "[o]nly when a genuine inconsistency, uncertainty, or ambiguity in meaning remains after resort to the ordinary rules of construction is [this] rule apposite." *Arawak Aviation, Inc. v. Indem. Ins. Co. of N.*

5

*Am.*, 285 F.3d 954, 956 (11th Cir. 2002) *(quoting State Farm Mut. Auto. Ins. Co. v. Pridgen,* 498 So.2d 1245, 1248 (Fla.1986)).

Plaintiff's policy included CGL coverage, which covers property damage, and a D&O endorsement, which the parties agree excludes coverage for property damage. Plaintiff's primary argument is that the claim does not involve property damage and that it is not excluded by the D&O endorsement. Defendant's primary argument is that the claim is property damage under the CGL, but is excluded from coverage. Thus, the threshold issue is whether the actions for which coverage is sought constitute "property damage." As discussed below, the Court finds that the relevant acts constitute property damage and therefore fall under the CGL policy.

*1. Property damage*

"Property damage" is defined by the CGL as "physical injury to tangible property, including all resulting loss of use of that property" or "loss of use of tangible property that is not physically injured." (CGL at 14). The parties do not contest that "tangible property" includes real property. *Aetna Cas. and Sur. Co. of Am. v. Deluxe Sys., Inc. of Fla.*, 711 So. 2d 1293, 1297 (Fla. 4th DCA 1998) (noting that Black's Law Dictionary includes real property in the definition of "tangible property"). Essentially, the parties' dispute is whether a "physical injury" took place. Plaintiff argues: 1) there was no physical injury, only a negative environmental impact; and 2) if there was any physical injury, it amounted to only a fraction of the area of property that was of low functional value before the dredging.

Central to this inquiry is whether there was an "injury," a term the policy does not define. Under Florida law, the terms of an insurance policy are construed "in light of the skill and experience of ordinary people," and courts commonly look to the plain meaning of words as set forth by legal and non-legal dictionaries. *Brill v. Indianapolis Life Ins. Co.*, 784 F.2d 1511, 1513 (11th Cir. 1986).

Policies are construed "to provide a reasonable, practical, and sensible interpretation consistent with the intent of the parties." *Senco of Fla., Inc. v. Cont'l Cas. Co.*, 440 So. 2d 625, 626 (Fla. 2nd DCA 1983).

Black's Law Dictionary defines "injury" as "[a]ny wrong or damage done to another, either in his person, rights, reputation, or property. The invasion of any legally protected interest of another." *See* Black's Law Dictionary 785 (6th ed. 1990). The non-legal definition of "injury" is similar: "harm or damage that is done or sustained; a particular form or instance of harm; wrong or injustice done or suffered." *See* Random House Unabridged Dictionary 983 (2nd ed. 1993).

It is undisputed that because of the dredging, Howard Creek was widened and deepened throughout the 3.4 mile stretch on which Plaintiff worked. Ms. Kastner testified that the "property was damaged" and significantly changed in its condition as it existed before the dredging. (Kastner Dep. at 92-93). The consent order states that the parties admitted that "alterations to the land occurred" (Dkt. 1, Exh. 5 at 1). *See* 9 *Couch on Insurance* § 129:6 (Lee R. Russ & Thomas F. Segalla eds., 3d ed. 2004) ("property suffers physical, tangible injury when the property is altered in appearance, shape, color or in some other material dimension"). That this activity was a "physical injury" is reinforced by the fact that the restoration plan required the reversal of the project: the transfer of the fill material back into the creek. Indeed, Plaintiff emphasizes that the "costs incurred to create and implement the restoration project were wholly to put the spoil back where it belonged." (Dkt. 17 at 17).[4]

Plaintiff argues that whatever harm occurred amounted to only a fraction of the area on which

---

[4] In addition to the removal of fill and placement of the fill on the banks, the Court finds that the accompanying loss of vegetation was property damage. As set forth above, vegetation was killed on the bottom of the creek when the fill was removed, and vegetation growing on the bank and on old fill piles was killed when new fill was placed on it. To the extent Ms. Kastner's and Mr. Ondercin's testimony can be taken to mean that turbid water was caused by the project, the Court finds that this was also property damage.

it worked and that the creek was of low functional value before the dredging.[5]  The Court does not accept this argument, because fill was removed along the entire 3.4 mile stretch of Howard Creek upon which Plaintiff worked.  Even if this were considered only partial damage, an item need not be completely destroyed in order to render it damaged.  *See e.g., Zurich Am. Ins. Co. v. Cutrale Citrus Juices USA, Inc.*, 2002 WL 1433728 (M.D. Fla. Feb. 11, 2002) (holding that adulterated juice product is damaged notwithstanding that it could be sold under different labeling). The CGL only requires physical injury.  It is undisputed that the land was physically injured.

Moreover, the fact that negative impacts on the environment are not easily quantified, or immediately apparent upon observation, does not change the fact that the underlying cause of these impacts was a physical injury.  In environmental contamination cases, courts routinely assume that property damage occurs by virtue of the introduction of pollutants into the environment.  *City of Delray Beach v. Agric. Ins. Co.*, 936 F. Supp. 931, 941 (S.D.Fla. 1994) ("The type of environmental contamination present in this case would fall squarely within the coverage for property damage in this policy were it not expressly excepted by the pollution exclusion").  The ordinary person understands that physical injury occurs to a stream when pollutants escape into the water, even though the effects of the pollution take place over time.  Similarly, the ordinary person would understand that Howard Creek and its surrounds were injured, even though certain potential environmental effects of this injury, such as flooding and erosion, could increase over time.

In summary, the Court finds that the dredging from the creek and depositing the fill on the bank of the creek constituted "property damage" under the CGL policy.

---

[5]  Mr. Pluta testified that in his estimate, sixty to seventy percent of the work was within maintenance. (Pluta Dep. at 102).  Mr. Henslick, an owner of the firm that developed Plaintiff's restoration plan, testified that the value of the land was low before the dredging.  (Henslick Dep. at 87-88).

2.      *Coverage under the CGL Policy* [6] [7]

Defendant contends that any one of three exclusions to coverage under the CGL policy applies.[8]  As discussed below, the Court finds that Exclusion 2j(5) applies because the property damage to the creek and its bank arose out of Defendant's performance of its dredging operations. The applicability of Exclusion 2a, relating to expected or intended property damage, need not, therefore, be reached.

3.      *The policy exclusions*

**Exclusion 2j(5)** excludes coverage for:

j. Property damage to

(5)     That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations.   (CGL at 4).

This exclusion applies, therefore, to property damage arising from and during the performance of operations.

_____

[6] The CGL, which is a standard form (CG 00 01 11 88), provides:
a.      We will pay those sums that the insured becomes legally obgliated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies.
b.      This insurance applies to "bodily injury" or "property damage" only if:
        (1) The "bodily injury" or "property damage" is caused by an occurrence that takes place in the 'coverage territory'; and
        (2) The "bodily injury" or "property damage" occurs during the policy period. (CGL, Dkt. 1, Exh. 1 at 11).

[7] Defendant does not challenge whether coverage under the CGL policy would be available for the specific sums paid by the Plaintiff.  Specifically, Defendant has not argued that the sums paid by Plaintiff are not "damages" under the policy.  In the context of environmental contamination cases pursuant to federal law, the district courts in Florida are split as to whether sums incurred for restoration are recoverable. *See e.g., U.S. v. Pepper's Steel and Alloys, Inc.,* 823 F. Supp. 1574, 1582 (S.D.Fla. 1993), *aff'd in relevant part,* 87 F.3d 1329 (11th Cir. 1996) (finding that the term "damages" did not distinguish between legal and injunctive relief under its common meaning and finding coverage for clean-up); *Harris Corp. v. Travelers Indem. Co.,* 1998 WL 165171 *9 (finding no coverage for clean-up, in case where "damages" was defined).  The parties have not briefed the merits of this issue on the facts of this case and the Court does not reach it here.

[8] Plaintiff briefed the application of exclusion 2(l). Defendant has not contended, however, that this exclusion applies.  This argument is therefore not addressed.

**Exclusion 2j(6)** excludes coverage for:

j. Property damage to

> (6)     That particular part of any property that must be restored, repaired or replaced because 'your work' was incorrectly performed on it. (CGL at 4).

This exclusion applies to property damage caused by deficient work performance on the property itself.

4.     *Policy exception to Exclusion 2j(6)*

Plaintiff purchased "products-completed operations hazard coverage," ("PCOH"), an exception to Exclusion 2j(6):

> Paragraph (6) of this exclusion does not apply to 'property damage' included in the 'products-completed operations hazard.'
>
> 'Products-completed operations hazard' includes all "bodily injury" and "property damage" occurring away from the premises you own or rent and arising out of "your product" or "your work" except:
> (1) Products that are still in your physical possession; or
> (2) Work that has not yet been completed or abandoned. (CGL at 4, 13).

As an initial matter, the Court notes that Florida courts have held that exclusions 2j(5) and 2j(6) are not ambiguous and are therefore enforceable according to their terms. *Am. Equity Ins. Co. v. Van Ginhoven*, 788 So.2d 388, 391 (Fla. 5th DCA 2001); *U.S. Fire Ins. Co. v. Meridian of Palm Beach Condominium Ass'n, Inc.*, 700 So. 2d 161, 162 (Fla. 4th DCA 1997).  Because the exclusions are related, as discussed below, their application is evaluated together.

It is undisputed that the work on Howard Creek was completed when Plaintiff stopped dredging the creek on May 27, 2004.[9]  Exclusion 2j(6), but for the PCOH coverage, would therefore

---

[9] In defining the time of completion, the CGL states:
'Your work' will be deemed completed at the earliest of the following times:
(1) When all of the work called for in your contract has been completed.
(2) When all of the work to be done at the site has been completed if your contract calls for work at more than one site.
(3) When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

exclude coverage for property damage to the creek for which restoration was required. However, the PCOH provides an exception to that exclusion when property damage arises out of *completed* work.

As noted, Exclusions 2j(5) and 2j(6) operate in tandem, excluding coverage for property damage arising from ongoing work and for repair or restoration of property because of deficient work. *See e.g. Van Ginhoven*, 788 So.2d at 391 (making no distinction between 2j(5) and 2j(6) in the analysis). These exclusions do not apply, however, to off-premises property damage arising from *completed* work. This reflects a long-standing principle behind commercial general liability policies, which the Florida Supreme Court has articulated as follows:

> [T]he purpose of this comprehensive liability insurance coverage is to provide protection for personal injury or for property damage caused by the completed product, but not for the replacement and repair of that product. To interpret the policy as providing coverage for construction deficiencies, as asserted by the petitioners and a minority of states, would enable a contractor to receive initial payment for the work from the homeowner, then receive subsequent payment from his insurance company to repair and correct deficiencies in his own work. We find this interpretation was not the intent of the contractor and the insurance company when they entered into the subject contract of insurance, and the language of the policy clearly excludes this type of coverage. Rather than coverage and payment for building flaws or deficiencies, the policy instead covers damage caused by those flaws. *LaMarche v. Shelby Mut. Ins., Co.*, 390 So. 2d 325, 326-27 (Fla. 1980).[10]

An initial question under both exclusions is whether, as Plaintiff argues, damage to "the

---

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.
(CGL at 13).

[10] As the Eleventh Circuit has noted, the Second District Court of Appeals, in *J.S.U.B. , Inc. v. U.S. Fire Ins. Co.*, 906 So. 2d 303 (Fla. 2d DCA 2005), moved away from the traditional expansive reading of *LaMarche*, in part due to changes in the standard CGL language. However, the Eleventh Circuit observed that "the broad language and reasoning of *LaMarche* does not seem to be dependent on the precise terms of the policy. Rather, *LaMarche* indicates that CGL policies generally do not cover the costs of repair or replacement of defective work." *Pozzi Window Co. v. Auto-Owners Ins.*, 446 F.3d 1178, 1185 (11th Cir. 2006). This Court cites *LaMarche* only with respect to general historical principles governing CGL coverage and exclusions. As set forth below, the instant case is analyzed based on the plain language of Plaintiff's CGL policy.

wetlands, the uplands, and any vegetation or wildlife in the areas immediately surrounding the creek" (Dkt. 29 at 6) constitute "the particular part of property" on which Plaintiff was "performing operations." Plaintiff argues that the exclusions do not apply because the volunteers only worked in the middle of the creek. This contention is contradicted, however, by Plaintiff's restoration plan, which states that the track hoe "was operated from the bank of the creek and spoil was deposited behind the machine as it progressed." (Dkt. 22-2 at 1). Moreover, there is no allegation that damage occurred to the wetlands and uplands other than to the areas in which Plaintiff worked.[11] Accordingly, the Court finds that Plaintiff was "performing operations" on the bed and banks of Howard Creek over the 3.4 mile stretch on which the fill piles were placed. *See Van Ginhoven*, 788 So.2d at 391 (contractor was working on only pool where damage occurred to deck, screen enclosure, and surrounding landscaping). Exclusion 2j(5) therefore applies to damage to those areas arising from the dredging if, as will be discussed, the work was completed when the damage occurred.

The existence of coverage turns on whether the damage to the real property arose "out of" ongoing work or completed work. In short, Defendant argues that the damage occurred during the dredging of the creek. Defendant contends, therefore, that the damage caused by the dredging is excluded from coverage under Exclusion 2j(5), as it was caused while Oak Ford was performing its work. Plaintiff, on the other hand, argues that the negative environmental impact occurred after the work was completed and, as a result, Exclusion 2j(5) does not apply and coverage is available. Defendant bears the burden of showing that a particular exclusion applies, specifically, that pursuant to Exclusion 2j(5), the property damage arose from ongoing operations as opposed to completed

---

[11] For instance, Ms. Kastner testified that although there had been a complaint from Myakka Valley Ranch, which is located downstream from the project, no flooding on that property was documented. (Kastner Dep. at 149).

work.

Plaintiff argues that "there is no evidence to pinpoint exactly when the actual 'property damage' occurred." (Dkt. 29 at 7). However, it is undisputed that the dredging and removing of the fill, which constitutes property damage, occurred during the project.   Similarly, the damage to vegetation took place when fill was removed from the creek and placed on the bank.  In attempting to avoid this conclusion, Plaintiff relies on Defendant's expert's statement that a "temporal loss" took place between the completion of the project and the implementation of the restoration plan, during which fill placement caused: 1) a loss of habitat for fish and wildlife and 2) a negative impact on water quality.  (Rosenweig Dep. at 35-36).

As distinguished from the damage to the real property from the dredging, any adverse impact on wildlife utilization of the creek (i.e., "loss of habitat for fish and wildlife") caused by the dredging does not constitute "property damage."  By contrast, changes in water quality brought about by the dredging and erosion are properly categorized as "property damage."  Although Ms. Kastner testified that she observed turbid water, she clarified that:

> the penalty matrix did not include State water quality violations for turbidity.  It merely included the fact that BMPs [best management practices] were not present and turbid water was observed, but it was not so egregious that it violated State water quality standards. (Kastner Dep. at 154).

According to Ms. Kastner, Plaintiff's penalty for water quality was assessed because Plaintiff did not use BMPs and turbid water was observed.   The failure to use BMPs -- barriers between the fill piles and the creek -- occurred during the project and is thus excluded under Exclusion 2j(5).[12]

---

[12] To the extent that damage to water quality is considered to have occurred after the completion of the project -- consequently falling under the PCOH -- Plaintiff does not possess coverage for damage to water quality. As noted above, the general coverage provision of the CGL states: "We will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." (CGL at 1).  Ms. Kastner's unequivocal testimony negates any inference that Plaintiff had to pay fines "because of" the effect on water quality.

*Conclusion*

Based on the foregoing, the Court finds that the property damage to Howard Creek arose during Plaintiff's dredging operations on Howard Creek. Accordingly, it is excluded from coverage by the plain language of Exclusion 2j(5) of the CGL policy.

Because there is no coverage, the Court need not reach Plaintiff's request for attorneys' fees incurred in defending the enforcement actions. *See Spencer v. Assurance Co. of Am.*, 39 F.3d 1146, 1149 (11th Cir. 1994) (noting that a determination of coverage is a condition precedent to recovery of attorney's fees against the insurer). Accordingly, it is

   **ORDERED AND ADJUDGED** that

   1)    Defendant's Motion for Summary Judgment (Dkts. 16, 25) is **GRANTED**;

   2)    Plaintiff's Motion for Summary Judgment (Dkt. 17) is **DENIED**;

   3)    The Clerk is directed to enter judgment in favor of Defendant and to close the case.

   **DONE AND ORDERED** in chambers this _28th_ day of February, 2007.

                                    **JAMES D. WHITTEMORE**
                                    **United States District Judge**

Copies to:
Counsel of Record